## DISTRICT COURT OF THE VIRGIN ISLANDS
### DIVISION OF ST. CROIX

| | | |
|---|---|---|
| **KELLY KANTZ,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 2008-0047** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNIVERSITY OF THE VIRGIN ISLANDS,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| ———————————————————— | ) | |

**Attorneys:**
**Lee J. Rohn, Esq.,**
**Mary Faith Carpenter, Esq.,**
St. Croix, U.S.V.I.
   *For Plaintiff*

**Marie E. Thomas-Griffith, Esq.,**
**Samuel H. Hall, Jr., Esq.,**
St. Thomas, U.S.V.I.
   *For Defendant*

## <u>MEMORANDUM OPINION</u>

THIS MATTER comes before the Court on Defendant's Motion for Summary Judgment (Dkt. No. 83, 85), Defendant's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment (Dkt. No. 84), Plaintiff's Revised Opposition to Defendant's Motion for Summary Judgment (Dkt. No. 110), Plaintiff's Revised Response to Defendant's Statement of Undisputed Material Facts and Counter-Statement of Additional Facts (Dkt. No. 111), Defendant's Supplemental Brief (Dkt. No. 114), Plaintiff's Response to Defendant's Supplemental Brief (Dkt. No. 117), Defendant's Reply to Plaintiff's Response (Dkt. No. 122), and Plaintiff's "Notice of Additional Authority" (Dkt. No. 124). For the reasons that follow, the Court will grant in part and deny in part Defendant's Motion for Summary Judgment.

# I.   BACKGROUND

### A.  Procedural History

Plaintiff Kelly Kantz ("Plaintiff") brings this reverse discrimination action against Defendant University of the Virgin Islands ("Defendant"), alleging discrimination on the basis of race and color, retaliation, and constructive discharge, in violation of both Title VII of the Civil Rights Act of 1964 and the Virgin Islands Civil Rights Act. (Dkt. No. 1 at 1, 12; Compl. ¶¶ 1, 59-60). She also asserts claims of defamation, defamation per se, and intentional or negligent infliction of emotional distress, and seeks compensatory and punitive damages, as well as attorney's fees and costs, and pre- and post-judgment interest. (*Id.* at 12-14; Compl. ¶¶ 62-73).

Defendant has filed a Motion for Summary Judgment, in which it seeks judgment as a matter of law on several grounds. (Dkt. Nos. 83, 85, 114, 122).[1] Specifically, Defendant argues that: (1) Plaintiff's Title VII claims are barred as untimely; (2) Plaintiff failed to administratively exhaust her "denial of tenure" allegations before the Equal Employment Opportunity Commission ("EEOC"); (3) Plaintiff has failed to establish a constructive discharge claim; (4) Plaintiff is not entitled to punitive damages; (5) Plaintiff has not established the existence of respondeat superior liability; (6) Plaintiff does not have a private cause of action under the Virgin Islands Civil Rights

---

[1] In the instant Motion, Defendant purports to have moved for summary judgment on "all claims set forth in [] Plaintiff's Complaint." (Dkt. No. 85 at 1). However, as described below, Defendant has articulated arguments for only certain claims. Only those claims for which Defendant has properly sought summary judgment will be addressed by the Court. *See* FED. R. CIV. P. 56(a), (c) (requiring a party to identify "each claim . . . on which summary judgment is sought" and "cit[e] to particular parts of materials in the record"); *see also United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)."); *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Similarly, in a supplemental brief, Defendant asserts that the Supreme Court's holding in *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013)—i.e., "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened [motivating factor] causation test," *id.* at 2533—has "a significant and favorable impact" on its pending motion for summary judgment. (Dkt. No. 114 at 1). However, Defendant has provided no argument to support this assertion. Because Defendant did not discuss the merits of its contention that *Nassar* supports its summary judgment motion, the Court will not consider the issue. *See Lanzotti*, 205 F.3d at 957, *supra*; *Zannino*, 895 F.2d at 17, *supra*.

Act; and (7) Plaintiff has failed to establish the necessary elements of defamation. (*See* Dkt. Nos. 85, 114, 122). Plaintiff opposes the Motion. (Dkt. Nos. 110, 111, 117).

For the reasons that follow, the Court will grant in part and deny in part Defendant's Motion for Summary Judgment. The Court will grant Defendant's Motion on statute of limitations grounds, as it pertains to all Title VII claims of discrimination that occurred more than 300 days prior to the filing of Plaintiff's charge of discrimination with the EEOC; grant Defendant's Motion on the constructive discharge claim; grant Defendant's Motion on the claim for punitive damages; deny Defendant's Motion as to administrative exhaustion of Plaintiff's "denial of tenure" allegations; deny Defendant's Motion as it pertains to its claim that Plaintiff has not established the existence of respondeat superior liability; deny Defendant's Motion on the claim that there is no private cause of action under the Virgin Islands Civil Rights Act; and deny Defendant's Motion on all but one of Plaintiff's defamation claims. The Court will also deny without prejudice Defendant's Motion as it pertains to Plaintiff's claims under the Virgin Islands Civil Rights Act, and set a schedule for further briefing, in view of the caution expressed by the Supreme Court of the Virgin Islands against using federal jurisprudence to interpret the local Civil Rights Act.

### B.  Factual Background

Plaintiff, a white female, was employed at the University of the Virgin Islands ("the University"), within its Division of Education ("Division"), now known as the School of Education, from 2004 to 2007 as an Assistant Professor of Education.[2] In August 2006, the University hired Dr. Cynthia Jackson ("Dr. Jackson"), a black female, as the Administrative Chairperson of the Division. Dr. Jackson then hired Dr. Rita Howard ("Dr. Howard"), also a black female, as the Assistant Chairperson of the Division. Plaintiff claims that both Dr. Jackson and Dr. Howard discriminated against her and other white employees within the Division based on their

---

[2] Plaintiff was employed at the University under three successive one-year contracts. (Dkt. No. 106-14).

race and color.[3] As a result of this alleged discrimination, Plaintiff contends that she was forced to resign from her position with the University in August 2007.

During the year leading up to her resignation, Plaintiff filed four grievances with the University.[4] The first grievance, filed on October 31, 2006 and addressed to Dr. Al Hassan I. Musah, the then Provost of the University ("Provost Musah"), alleged that Dr. Jackson—in violation of the Faculty Policy Manual—indicated during a meeting on October 20, 2006, that no faculty member would be paid over load pay for teaching additional classes during the Fall 2006 semester until class cancellations occurred for the Spring 2007 semester. (Dkt. No. 105-22).[5] The grievance was settled on December 8, 2006, when the University paid Plaintiff—prior to the end of the Fall 2006 semester—the over load pay she had earned. (Dkt. No. 85-3 at 2).

On March 26, 2007, Plaintiff filed two additional grievances. The first of the two grievances alleged that Dr. Jackson had not, as requested, updated Plaintiff's Faculty Utilization Report ("FUR") to reflect additional work she had done—i.e., teaching an independent study course to a student. (Dkt. No. 106-25). This grievance was settled when Provost Musah updated Plaintiff's FUR to accurately reflect the additional course. (*See* Dkt. No. 85-1 at 5).

The second of the two grievances alleged that Dr. Jackson slept for approximately 20 minutes during a one-hour observation of Plaintiff's class, and that the subsequent evaluation was inaccurate and "punitive in nature." (Dkt. No. 106-24 at 1). Plaintiff requested that Dr. Jackson's

---

[3] Dr. J. Jeannette Lovern and Dr. Paul Abney, former faculty members in the Division of Education, both separately filed reverse discrimination actions against the University of the Virgin Islands. *See Lovern v. Jackson, et al.*, 1:08-cv-0082; *Abney v. University of the Virgin Islands*, 1:08-cv-0116.

[4] "A grievance is a claim by a faculty member that the University, or someone acting on behalf of the University, has failed to comply with one or more of the provisions of the *Faculty Policy Manual* in its treatment of or dealings with the faculty member." (Dkt. No. 85-1 at 12 (2003 Faculty Policy Manual, p. 31)).

[5] The section of the Faculty Policy Manual quoted in the October 31, 2006 grievance states that: "Full-time faculty who teach an over load (more than 12 credits) in a Fall semester shall be compensated for said over load at the end of that semester <u>unless the faculty member chooses to defer compensation</u> until the end of the academic year." (Dkt. No. 105-22 (emphasis in original)).

evaluation be removed from her personnel record and that the University "assign a colleague to complete a new classroom observation." (*Id.*). In a written response to Plaintiff's grievance, Dr. Jackson denied sleeping during her observation of Plaintiff's class. (*See* Dkt. No. 106-6).

On May 8, 2007, Provost Musah informed Plaintiff and Dr. Jackson that Dr. Utha O. Williams ("Dr. Williams"), Interim Executive Director for Global and Graduate Education at the University, had reviewed Plaintiff's grievance concerning Dr. Jackson's classroom observation and evaluation, and that Dr. Williams had made the following recommendation:

> The redress for a faculty member who is dissatisfied with the ratings of a classroom observation as part of the annual evaluation process is to provide written response or rebuttal on the points in question. Such rebuttal document shall become part of the official [personnel] record along with, but not in place of, the performance appraisal or evaluation conducted by the Administrative Chair.
>
> With respect to the request that a colleague be assigned to complete a new classroom observation, the reviewer finds it is inappropriate for an alternate faculty member within the division, someone who was not present at the observation or who is not part of the annual evaluation process, to conduct an independent observation of the faculty member's performance. A follow-up attempt at dialog between the faculty member and the Administrative Chair is recommended.

(Dkt. No. 85-1 at 5-6). Provost Musah advised Plaintiff that if she was dissatisfied with Dr. Williams' recommendation, she could, within two weeks of receipt of Dr. Williams' report and recommendation, submit a written request for a hearing before the Faculty Grievance Committee. (*Id*. at 6). In a letter dated May 16, 2007, Plaintiff requested such a hearing. (Dkt. No. 106-4).

The hearing was held on June 27, 2007. After the hearing, the Faculty Grievance Committee issued a report to Provost Musah, in which it made the following findings:

> The Faculty Grievance Committee received testimony from two students in Dr. Kantz's class confirming the allegation that Dr. Jackson slept during her classroom observation of Dr. Kantz. The Committee believes that this fact alone invalidates any statements made by Dr. Jackson in the Classroom Observation Appraisal Form. Moreover, without commenting on Dr. Jackson's professional judgments of Dr. Kantz's performance, the Committee finds that the use of sarcasm in referring to Dr. Kantz's knowledge of the subject matter of the lesson indicates that Dr. Jackson's Classroom Observation Appraisal was disrespectful and less than objective. The Committee therefore believes that the opportunity for the faculty

member to attach a written response to the disputed evaluation, which is a normal part of the evaluation procedure, is not sufficient redress in this case due to the extraordinary circumstances.

(Dkt. No. 106-6). Based on the foregoing, the Committee recommended that:

> [T]he Classroom Observation Appraisal Form submitted by Dr. Jackson be withdrawn from Dr. Kantz's personnel file, and that she be given the opportunity for a new Classroom Observation by a senior member of the faculty in the Education Division.

(*Id.*).

On July 23, 2007, Provost Musah sent a Memorandum to the Faculty Grievance Committee, in which he accepted the Committee's recommendation that the University remove Dr. Jackson's evaluation from Plaintiff's personnel file, but rejected the Committee's recommendation that a senior faculty member in the Education Division conduct another observation of Plaintiff's teaching. (Dkt. No. 85-1 at 7). Provost Musah explained that such a practice would be inconsistent with the University's evaluation process. (*Id.*).

Meanwhile, on March 29, 2007, several members of the faculty, including Plaintiff, filed a "vote of no confidence" against Dr. Jackson and Dr. Howard. In a letter addressed to Provost Musah, the faculty stated that Dr. Jackson and Dr. Howard were "acting in such a manner as to 'unreasonably interfere with [their] ability to perform [their] professional duties effectively and [were] unnecessarily disrupting [their] well-being.'" (Dkt. No. 106-2 (quoting 2003 Faculty Policy Manual, p. 31)). In the letter, the faculty set forth a list of specific instances that they asserted occurred "in a climate created by the undemocratic, disrespectful, and discriminatory behaviors of [Dr. Jackson and Dr. Howard]." (*Id.*).

Plaintiff claims that in retaliation for her participation in the "vote of no confidence," Dr. Howard, on April 9, 2007, reduced her "advisee load from 56 to about 15 students." (Dkt. No. 106-3 at 1). Later that same day, Plaintiff informed John Sokolski ("Mr. Sokolski"), then Human Resources Director at the University, about the reduction in the number of her advisees. (*Id.*). In

an e-mail, Plaintiff stated that she perceived the reduction to mean that she did not have a job, and that the reduction "may be retaliatory in nature given that [she] participated in the complaint [] submitted by about 80% of the Education faculty and [] presented on the lack of democratic processes in [the] current Division administration at the faculty meeting on March 31st." (*Id.*). In response, Mr. Sokolski assured Plaintiff that she had "a contract for the new term." (*Id.*).

On April 16, 2007, Plaintiff filed a fourth grievance with the University, alleging that Dr. Jackson and Dr. Howard provided students and advisors with a "paradigm" that was inconsistent with the degree program for Inclusive Early Childhood Education that was approved by the Board of Trustees. (Dkt. No. 106-27). Plaintiff further alleged that she requested to discuss the issue at the Division meeting on April 18, 2007, but that her request was denied. (*Id.*). The resolution of this grievance is unclear from the record.

Four months later, in August 2007, Plaintiff claims that she, as well as every other faculty member who participated in the "vote of no confidence" against Dr. Jackson and Dr. Howard, received an unsatisfactory evaluation from Dr. Jackson. (Dkt. No. 110 at 5-6). As a result, on August 3, 2007, Plaintiff alleges that "in order to not ruin her career in teaching" she submitted a letter of resignation to the University. (*Id.* at 6). In her letter of resignation, Plaintiff noted that she had endured "abuse and discrimination" at the University, and that the "hostile environment ha[d] negatively impacted [her] health and [her] professional well-being." (Dkt. No. 106-8).

## II.    STANDARD OF REVIEW

To prevail on a motion for summary judgment, a movant must show that there is "no genuine dispute as to any material fact," and that, on the uncontroverted facts, it is "entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Bonkowski v. Oberg Indus.*, 787 F.3d 190, 195 n.1 (3d Cir. 2015). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Mahoney v. McDonnell*, 616 F. App'x 500, 504 (3d Cir.

2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party has met this burden, the non-moving party "must set forth specific facts showing a genuine issue for trial and may not rest upon mere allegations, general denials, or . . . vague statements." *Patterson v. Glory Foods, Inc.*, 555 F. App'x 207, 211 (3d Cir. 2014) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991) (internal quotation marks omitted; alteration in original)); *see also* FED. R. CIV. P. 56(c).

In reviewing a motion for summary judgment, "[a]ll facts are viewed in the light most favorable to the nonmoving party, who is 'entitled to every reasonable inference that can be drawn from the record.'" *Seamans v. Temple Univ.*, 744 F.3d 853, 859 (3d Cir. 2014) (quoting *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000)). In addition, "at the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder." *Anderson v. Warden of Berks County Prison*, 602 F. App'x 892, 895 (3d Cir. 2015) (quoting *Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (internal quotation marks omitted)).

The role of the court is to "determine whether there is a genuine issue for trial." *Stiegel v. Peters Twp.*, 600 F. App'x 60, 63 (3d Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (internal quotation marks omitted)). A genuine issue of material fact exists when the fact-finder, viewing the record evidence, could rationally find in favor of the non-moving party. *See Anderson*, 477 U.S. at 248. When a genuine issue of material fact exists, summary judgment is inappropriate. *See Fontroy v. Beard*, 559 F.3d 173, 182 (3d Cir. 2009) (citations omitted).

### III.     DISCUSSION

#### A.  Applicable Legal Principles

Under Title VII of the Civil Rights Act of 1964 ("Title VII"), it is unlawful for an employer

> to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment . . . or to limit . . . or classify his employees . . . in any way which would deprive . . . any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1)-(2). In the instant case, Plaintiff, who is white, alleges that Defendant discriminated against her on the basis of her race and color. (Dkt. No. 1 at 2; Compl. ¶ 5). Racial discrimination against Caucasians is commonly referred to as "reverse discrimination." *See Carey v. Fed. Express Corp.*, 519 F. App'x 772, 776 (3d Cir. 2013) (citing *Iadimarco v. Runyon*, 190 F.3d 151, 158 (3d Cir. 1999)).

In reverse discrimination cases, the court applies a modified version of the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Mosca v. Cole*, 217 F. App'x 158, 161 (3d Cir. 2007) (citing *Iadimarco*, 190 F.3d at 158). Under this analysis, the plaintiff must first establish a *prima facie* case of discrimination by presenting "sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII." *Id.* (quoting *Iadimarco*, 190 F.3d at 161) (internal quotation marks omitted).[6] Once the plaintiff establishes a *prima facie* case of discrimination, the burden then shifts to the employer to articulate some legitimate, non-discriminatory reason for its adverse action. *See id.* (citing *Iadimarco*, 190 F.3d at

---

[6] Because the first prong of the traditional *McDonnell Douglas* test "requires plaintiff to establish his or her identity as a member of a minority group," this prong has been modified for reverse discrimination cases, as set forth above. *See Iadimarco v. Runyon*, 190 F.3d 151, 158 (3d Cir. 1999). "[T]he evidentiary burden at this stage is rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent—i.e., that discrimination could be a reason for the employer's action." *Messina v. E.I. DuPont de Nemours & Co.*, 141 F. App'x 57, 59 (3d Cir. 2005) (quoting *Marzano v. Computer Science Corp.*, 91 F.3d 497, 508 (3d Cir. 1996) (internal quotation marks omitted)).

157).[7] If the employer meets this "relatively light burden," the plaintiff must show by a preponderance of the evidence that the stated reason is merely a pretext for discrimination. *See id.*; *see also White v. Planned Sec. Servs.*, 480 F. App'x 115, 118 (3d Cir. 2012) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (internal quotation marks omitted)).

In order to satisfy this burden of demonstrating pretext, the plaintiff must point to "some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Burton v. Teleflex Inc.*, 707 F.3d 417, 427 (3d Cir. 2013) (quoting *Fuentes*, 32 F.3d at 764) (internal quotation marks omitted)). The plaintiff must show pretext by demonstrating "such 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] nondiscriminatory reasons.'" *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 199 (3d Cir. 2015) (quoting *Ross v. Gilhuly*, 755 F.3d 185, 194 n.13 (3d Cir. 2014) (alteration in *Ross*)). When the plaintiff offers evidence "that would allow reasonable minds to conclude that the evidence of pretext is more credible than the employer's justifications, the employer's motion for summary judgment must fail." *Maxwell v. Springer*, 274 F. App'x 186, 189 (3d Cir. 2008) (quoting *Iadimarco*, 190 F.3d at 166) (internal quotation marks omitted)).

---

[7] The burden on the employer "is one of production, not persuasion; it can involve no credibility assessment." *Medcalf v. Trs. of Univ. of Pa.*, 71 F. App'x 924, 927 (3d Cir. 2003) (quoting *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 142 (2000) (internal quotation marks omitted)). The Supreme Court has explained that, "although the *McDonnell Douglas* presumption shifts the burden of *production* to the defendant, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (emphasis in *St. Mary's*)). Thus, "the defendant need not persuade the [trier of fact] that it was actually motivated by the proffered reasons." *Id.* at 510 (internal quotation marks omitted).

### B.  Analysis

#### 1.  Statute of Limitations

As a threshold matter, Defendant argues that Plaintiff's Title VII claims are untimely because they occurred more than 300 days prior to the filing of Plaintiff's charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Dkt. No. 85 at 7). Defendant contends that Plaintiff filed her charge of discrimination with the Virgin Islands Department of Labor and the EEOC on January 9, 2008. (*Id.*). Therefore, any alleged acts of discrimination that occurred prior to March 15, 2007—the beginning date of the 300-day limitations period—are time-barred. (*Id.* at 8).

In opposition, Plaintiff asserts that her charge of discrimination was filed with the EEOC on November 13, 2007, as evidenced by a date stamp on the charge (Dkt. No. 105-16), and that the 300-day limitations period should be tolled under the continuing violation doctrine for any acts of discrimination that occurred prior to January 13, 2007—the beginning date of the 300-day limitations period (Dkt. No. 110 at 19-20).[8]

Before a plaintiff may initiate a federal civil action under Title VII, she must first file a timely charge of discrimination with the EEOC. *See Delprato v. Day Chevrolet, Inc.*, 427 F. App'x 86, 89 (3d Cir. 2011) (citing 42 U.S.C. § 2000e-5). Ordinarily, such charge must be filed within 180 days after the alleged act of discrimination. *See* 42 U.S.C. § 2000e-5(e)(1). However, the filing period is extended to 300 days when, as in this case, the state or territory within which the alleged act of discrimination occurred has a law prohibiting employment discrimination and authorizes a state or territorial agency to enforce that law. *Id.*; *see also Bethea v. Merchs. Commer. Bank*, 2014

---

[8] Contrary to Plaintiff's assertion, 300 days prior to November 13, 2007 is January 17, 2007, not January 13, 2007. Therefore, the Court will use January 17, 2007 as the beginning date of the 300-day limitations period.

U.S. Dist. LEXIS 124764, at *12 (D.V.I. Sept. 8, 2014).[9] The plaintiff must have "initially instituted proceedings" with the state or territorial agency in order for the 300-day filing period to apply. *See* 42 U.S.C. § 2000e-5(e)(1).

In the Virgin Islands, employment discrimination claims are governed by the Virgin Islands Civil Rights Act ("VICRA"), 10 V.I.C. § 1, *et seq*., which is enforced by the Virgin Islands Department of Labor ("DOL"). Plaintiff instituted proceedings with the DOL pursuant to the VICRA. (*See* Dkt. No. 105-16). Therefore, Plaintiff had 300 days after the occurrence of an alleged discriminatory act within which to file a charge of discrimination with the EEOC.[10]

In the instant case, Plaintiff alleges acts of discrimination that began as early as October 2006 and continued through August 2007. (Dkt. No. 1 at 2-11; Compl. ¶¶ 12-53). The Court finds, based on the date stamp on the charging document, that Plaintiff filed her charge of discrimination with the DOL and the EEOC on November 13, 2007, and not January 9, 2008. *See Lovern v. Jackson*, 2015 U.S. Dist. LEXIS 12238, at *22 (D.V.I. Feb. 3, 2015).[11] Thus, any alleged acts of

---

[9] Title 42, section 2000e-5(e)(1) of the United States Code provides:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred [. . .] except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.

42 U.S.C. § 2000e-5(e)(1). The term "State" is defined as "a State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, Wake Island, the Canal Zone, and Outer Continental Shelf lands defined in the Outer Continental Shelf Lands Act." 42 U.S.C. § 2000e(i).

[10] The parties do not dispute that the 300-day limitations period applies in this case.

[11] In *Lovern v. Jackson*, 2015 U.S. Dist. LEXIS 12238 (D.V.I. Feb. 3, 2015), this Court explained that under the worksharing agreement between the DOL and the EEOC, "charges received by the DOL that are 'jurisdictional with the EEOC and timely filed . . . will be automatically dual-filed with the EEOC' and that the date of filing is when the charge is received." *Id*. at *22 (quoting Worksharing Agreement § II.C (2008) (alteration in *Lovern*)). The record indicates that Plaintiff's charge of discrimination was received by the DOL and the EEOC on November 13, 2007. (*See* Dkt. No. 105-16). The January 9, 2008 date referenced by Defendant is the date that the "Notice of Charge of

discrimination that occurred prior to January 17, 2007—the beginning date of the 300-day limitations period—cannot form the basis of Plaintiff's Title VII claim unless an "equitable exception to the timely filing requirement" applies. *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995). One such exception is the continuing violation doctrine. *Id.*

Under the continuing violation doctrine, a plaintiff may pursue claims for discriminatory conduct that occurred prior to the 300-day limitations period "if he [or she] can demonstrate that the act is part of an ongoing practice or pattern of discrimination by the defendant." *Id.* (citations omitted). To establish a continuing violation, the plaintiff must show that: (1) "at least one discriminatory act occurred during the 300-day period" and (2) the "discrimination was part of a continuing pattern of discrimination, as opposed to isolated or sporadic acts of intentional discrimination." *Taylor v. Brandywine Sch. Dist.*, 202 F. App'x 570, 574 (3d Cir. 2006) (citing *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 481 (3d Cir. 1997)). "A plaintiff satisfying these requirements may present evidence and recover damages for the entire continuing violation, and the 300-day filing period will not act as a bar." *Rush*, 113 F.3d at 481 (citing *West*, 45 F.3d at 755).

To determine whether the continuing violation doctrine applies, the Third Circuit has instructed courts to consider: "(1) whether the violations were related in subject matter and (2) whether the acts were recurring." *Bennett v. Susquehanna County Children & Youth Servs.*, 592 F. App'x 81, 84 (3d Cir. 2014) (citing *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001)).[12] In considering the subject matter, courts look at "whether the violations constitute the same type

---

Discrimination" was sent to Defendant, not the date that the charge of discrimination was received by the EEOC. (*See* Dkt. No. 85-1 at 19).

[12] In previous cases, the Third Circuit set forth three factors to consider when determining whether there was a continuing violation—subject matter, frequency, and degree of permanence. *See Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001); *see also West v. Philadelphia Elec. Co.*, 45 F.3d 744, 755 n.9 (3d Cir. 1995); *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 481-82 (3d Cir. 1997). However, in *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157 (3d Cir. 2013), the Third Circuit stated that "there is no longer a permanency requirement under the continuing violation doctrine[.]" *Id.* at 166 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117-18 (2002)). Therefore, the Court will conduct its analysis accordingly.

of discrimination, tending to connect them in a continuing violation." *Budzash v. Howell Twp.*, 451 F. App'x 106, 109 (3d Cir. 2011) (quoting *Cowell*, 263 F.3d at 292). The frequency of the acts is determined by considering whether the acts are recurring "or more in the nature of an isolated work assignment or employment decision." *Rush*, 113 F.3d at 482 (quoting *Berry v. Board of Supervisors of Louisiana State Univ.*, 715 F.2d 971, 981 (5th Cir. 1983)). "[C]ourts have not set a standard for how close the acts must occur to amount to a continuing violation." *Bennett*, 592 F. App'x at 84 (citing *Cowell*, 263 F.3d at295). However, in *West v. Philadelphia Electric Company*, the Third Circuit "associate[ed] consistency with plaintiff's daily exposure to offensive material." *Id.* (citing *West*, 45 F.3d at 755-56).

Plaintiff has alleged that there is no dispute that Dr. Jackson's "false and retaliatory" classroom evaluation occurred during the 300-day limitations period that preceded the filing of her November 13, 2007 EEOC charge of discrimination. (Dkt. No. 110 at 20).  The Court agrees that this alleged discriminatory act falls within the applicable 300-day period. From the record, it appears that Dr. Jackson observed Plaintiff's classroom on March 7, 2007, and that Plaintiff received a "Classroom Observation Appraisal Form" on or about March 11, 2007. (*See* Dkt. No. 1 at 7; Compl. ¶ 35-36; Dkt. No. 85-2 at 6). Accordingly, the Court finds that Plaintiff has alleged at least one discriminatory act that falls within the 300-day statute of limitations period.

Plaintiff has not, however, met her burden of demonstrating a continuing violation. In support of her continuing violation argument, Plaintiff alleges that a number of discriminatory acts occurred in the fall of 2006. Specifically, Plaintiff claims that: (1) Dr. Jackson refused to provide Plaintiff and other white faculty with supplies to teach; (2) on October 28, 2006, Dr. Jackson sent the white faculty rude e-mails, including a "demeaning and insulting email[] to [Plaintiff] questioning [Plaintiff's] ability to coordinate and teach the Inclusive Early Childhood Program"; (3) on October 23, 2006, Dr. Jackson "eliminated many of the courses Plaintiff was scheduled to

teach";[13] (4) Dr. Jackson refused to sign documents that would allow Plaintiff to get paid for work she had completed; and (5) Dr. Jackson threatened Plaintiff with termination at an October 31, 2006 meeting. (Dkt. No. 110 at 21-22).[14]

In her Opposition to Defendant's Motion for Summary Judgment, Plaintiff also references the following claims that were delineated in her Response to Defendant's Statement of Undisputed Material Facts: (1) on October 17, 2006, Dr. Jackson informed Plaintiff that she "did not know [her] place" because Plaintiff had requested to be excused from convocation, requested to participate in a national PRAXIS Committee during a Division meeting, and requested to discuss "regular" business during a Division meeting; (2) on October 25, 2006, Dr. Jackson informed Plaintiff that "she would not be reimbursed for ink cartridges" that Plaintiff "purchased at a discount for the University"; (3) on October 25, 2006, Dr. Jackson demanded that Plaintiff provide her with projected enrollment for all of her remaining courses, but made no such demand on the non-white faculty; (4) in retaliation for a grievance filed on October 31, 2006, Dr. Jackson, on November 2, 2006, sent Plaintiff an e-mail unilaterally changing her previously approved spring class schedule, adding four new courses, and canceling an existing course; and (5) on January 14, 2007, Dr. Jackson refused to speak with Plaintiff about a scheduling issue between Plaintiff and a black teacher; Dr. Jackson allegedly only spoke with the black teacher. (Dkt No. 111 at 2-3; ¶ 3).

---

[13] Plaintiff states that the courses that were eliminated on October 23, 2006 "would have been taught in 2007 and the loss of income occurred in 2007." (Dkt. No. 110 at 21). However, "[a] continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *Cowell v. Palmer Twp.*, 263 F.3d 286, 293 (3d Cir. 2001) (citation and internal quotation marks omitted). Therefore, the allegation that Plaintiff lost income in 2007 as a result of the elimination of her courses in 2006 has no effect on the Court's analysis of whether there was a continuing violation in this case.

[14] Plaintiff also makes the undated allegation that "Dr. Jackson treated Plaintiff and other white faculty in a disrespectful manner different than how Dr. Jackson treated black faculty[.]" (Dkt. No. 110 at 21). However, she does not specifically identify any affirmative acts by Dr. Jackson that constituted the alleged disrespectful treatment. *See Cowell*, 263 F.3d at 293 ("The focus of the continuing violations doctrine is on [the] affirmative acts of the defendant[].").

Based on the governing law, the Court finds that all of the alleged acts of discrimination claimed by Plaintiff—in both her Opposition to Defendant's Motion for Summary Judgment and her Response to Defendant's Statement of Undisputed Material Facts—are "discrete" acts that occurred prior to the 300-day limitations period, and therefore cannot be aggregated as a continuing violation. Specifically, the Court finds that, although the alleged acts of discrimination may be described as of a similar subject matter—i.e., as relating to Plaintiff's teaching responsibilities—Plaintiff has not alleged any "recurring" acts by Dr. Jackson that would satisfy the frequency requirement of a continuing violation. Each of the alleged incidents of discrimination is "more in the nature of an isolated work assignment or employment decision," *Rush*, 113 F.3d at 482, and thus constitutes distinct claims of employment discrimination.

In *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002), the Supreme Court explained that the continuing violation doctrine does not apply to "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire" because "[e]ach incident of discrimination and each retaliatory adverse employment action constitutes a separate actionable 'unlawful employment practice.'" *Id*. at 114. The Third Circuit, recognizing that "*Morgan* provides fairly precise guidance as to what sorts of acts are 'discrete,'" has expounded on the list set forth in *Morgan* by adding to the non-exhaustive list of discrete acts: "wrongful suspension, wrongful discipline, denial of training, [and] wrongful accusation." *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006) (citing *Morgan*, 536 U.S. at 114).

Applying *Morgan/O'Connor* to the allegations listed above, the Court finds that Plaintiff has alleged a series of discrete acts that do not collectively constitute a continuing violation. *See id*. (declining to apply the continuing violation doctrine where the plaintiff alleged, *inter alia*, that the defendant "provided him with inadequate staff and resources, assigned him excessive work, changed his work schedule, filed unwarranted disciplinary complaints against him, [and] failed to

16

credit him with overtime"); *cf. Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (finding a continuing violation where the alleged sexual harassment and discrimination "suggest[ed] a persistent, ongoing pattern"). Accordingly, the Court will grant Defendant's Motion for Summary Judgment on statute of limitations grounds as to all claims of discrimination that occurred prior to January 17, 2007—the beginning date of the 300-day limitations period.

### 2. Administrative Exhaustion

Another threshold issue advanced by Defendant relates to administrative exhaustion of allegations in the Complaint. In the instant Motion for Summary Judgment, Defendant argues that Plaintiff's "denial of tenure" allegations are not properly before the Court because they were not raised in the charge of discrimination she filed with the EEOC. (Dkt. No. 85 at 10).[15] Specifically, Defendant contends that Plaintiff never stated in her affidavit supporting her EEOC charge that "she was to be targeted next for denial of tenure as a result of discrimination and retaliation" or that she was "forced to resign [from her position at the University] before she was denied tenure." (*Id.*). Defendant asserts that the affidavit simply mentions that "a white faculty member was denied tenure in June of 2007." *Id.*[16]

---

[15] The Complaint contains the following tenure-related allegations:

> 51. In June 2007, a white faculty member in the education department who had been previously recommended for tenure at all levels was denied tenure as a result of discrimination and retaliation. This discriminatory and retaliatory recommendation was followed by the board of trustees.

> 52. It became clear to the Plaintiff that she was to be targeted next for denial of tenure as a result of the discrimination and retaliation and that the board of trustees would ratify the decision as it had failed to take any action to investigate the multiple complaints by several faculty members of discrimination and retaliation.

> 53. Because a denial of tenure would be permanently detrimental to the Plaintiff's career, she was forced to resign her position in June 2007, before the same occurred, and to leave the Virgin Islands to look for employment in the states.

(Dkt. No. 1 at 11; Compl. ¶¶ 51-53).

[16] Defendant also points out that Plaintiff was not eligible, and did not apply, for tenure before her departure from the University. (Dkt. No. 85 at 10). To the extent that Plaintiff's Title VII discrimination claim is based on an alleged discriminatory denial of tenure, her claim fails as a matter of law. Plaintiff has presented no evidence that before she

In response, Plaintiff states that her "claims about denial of tenure consideration [are] properly before the court as [they were] referenced within the scope of her EEOC Charge." (Dkt. No. 110 at 24). To support this argument, Plaintiff asserts that her EEOC affidavit specifically made reference to Dr. Jackson's retaliatory classroom evaluation; that the affidavit refers to the March 26, 2007 grievance she filed about the retaliatory classroom evaluation; and that the March 26, 2007 grievance quotes the relevant portion of the Faculty Policy Manual that addresses evaluations, advancement in salary, and promotion in rank. (*Id*. at 23).[17] Plaintiff asserts that it was incumbent upon the EEOC to investigate the March 26, 2007 grievance and that the "grievance speaks specifically to the nature of the retaliatory evaluation and how it affects [Plaintiff's] ability to be promoted and obtain tenure." (*Id*. at 23-24).

In determining whether claims have been administratively exhausted, the relevant inquiry is "whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." *Antol v. Perry*, 82 F.3d 1291, 1295 (3d Cir. 1996) (quoting *Waiters v. Parsons*, 792 F.2d 233, 237 (3d Cir. 1984)). In other words, "the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Webb v. City of Phila.*, 562 F.3d 256, 263 (3d Cir. 2009) (quoting *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398-99 (3d Cir. 1976)). Thus, in order for Plaintiff to proceed with her claim that

---

resigned on August 3, 2007, she was eligible and applied for tenure, or that Defendant had already begun to consider her eligibility for tenure. Accordingly, she cannot maintain a Title VII claim on that basis.

[17] The March 26, 2007 grievance states, in pertinent part:

> The section of the Faculty Policy Manual describing the purpose of evaluations follows:
>
> 10 ANNUAL EVALUATION, ADVANCEMENT IN SALARY, AND PROMOTION IN RANK
> Evaluations are necessary to provide enabling direction and assistance to faculty in their attainment of promotion and tenure and to promote meaningful dialog on activities considered essential to the success of the university in fulfilling its mission.

(Dkt. No. 106-24 at 1).

the alleged retaliatory evaluation by Dr. Jackson affected her "ability to be promoted and obtain tenure" (Dkt. No. 110 at 24), the allegations pleaded in the Complaint must fall fairly within the scope of her EEOC charge of discrimination or the resulting EEOC investigation.

Based upon a review of the affidavit submitted in support of Plaintiff's EEOC charge of discrimination, the Court finds that an examination of the alleged retaliatory evaluation by Dr. Jackson and the potential effect evaluations have on a faculty member's attainment of promotion and tenure would have been fairly within the scope of an investigation of Plaintiff's EEOC charge. (*See* Dkt. No. 106-24 at 1). In the affidavit, Plaintiff stated that, on March 26, 2007, she filed a grievance "regarding Dr. Jackson's report of her classroom observation" (Dkt. No. 85-1 at 26; ¶ 31), which included a reference to the portion of the Faculty Policy Manual that describes the effect evaluations have on promotion and tenure, *see* n.17, *supra*. She further alleged that "[i]n June 2007, a white faculty member in Education, who had been recommended for tenure at all levels, was denied tenure by the Board of Trustees." (Dkt. No. 85-1 at 29; ¶ 39). Immediately thereafter, she alleged that "[i]t was made clear to [her] that [she] would not be given fair treatment due to [her] race and color and that the administration of the University was ratifying and acquiescing in the actions and retaliation." (*Id*. ¶ 40). Plaintiff then continued in the affidavit that "[a]s a result, in order not to ruin [her] career in teaching, [she] was forced to resign [her] position with the University [o]f the Virgin Islands," and that she had "been discriminated in [her] pay, benefits, evaluations, treatment, advancement, class assignments, and promotions as a result of [her] color and race . . . ." (*Id*. at ¶¶ 40-41).

Taken in their totality, these allegations are sufficient to assert, and give notice to Defendant of, the allegations pleaded in Plaintiff's Complaint related to the alleged retaliatory evaluation by Dr. Jackson and its potential effect on Plaintiff's attainment of promotion and tenure. *See Barzanty v. Verizon Pa., Inc.*, 361 F. App'x. 411, 414 (3d Cir. 2010) ("Because the EEOC is

required to serve notice on the employer against whom the charges are made, this standard also allows an employer to be put on notice of the claims likely to be filed against it."). This is especially so where, as here, the allegations in Plaintiff's EEOC charge are virtually identical to those set forth in Plaintiff's Complaint. *See* n.15, *supra*. Accordingly, the Court will deny Defendant's Motion for Summary Judgment as it relates to administrative exhaustion of Plaintiff's "denial of tenure" allegations.[18]

---

[18] Defendant makes two additional threshold arguments both of which lack merit. First, Defendant argues that under *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), "a plaintiff may not recover damages for discriminatory conduct, unless a school district official who has the authority to institute corrective measures on the institution's behalf has actual notice of, and is deliberately indifferent to, the alleged misconduct." (Dkt. No. 85 at 11). Defendant contends that "Plaintiff never gave notice of racial discrimination against her, and [that] there is no University official that [Plaintiff] alleges was deliberately indifferent to the alleged discrimination occasioned by Dr. Jackson." (*Id.*). This argument fails because the actual notice and deliberate indifference requirements of *Gebser* apply to sex discrimination claims brought under Title IX, not race discrimination claims—at issue here—brought under Title VII. *See Pociute v. W. Chester Univ.*, 117 F. App'x 832, 835 (3d Cir. 2004) ("In a sexual harassment suit brought under the implied right of action under Title IX, 'damages may not be recovered . . . unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct.'") (quoting *Gebser*, 524 U.S. at 277 (alteration in *Pociute*); *accord Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999) ("[I]n the case of a Title IX claim (but not under Title VII), the institution must have had actual knowledge of the harassment and have exhibited deliberate indifference to it.") (citing *Gebser*, 524 U.S. at 285-89). Therefore, *Gebser* is not applicable to this case.

Second, Defendant argues that "this Court lacks jurisdiction to address [] Plaintiff's claims because she failed to preserve her right to judicial review by [] filing of a petition for writ of review." (Dkt. No. 85 at 14). Defendant contends that Plaintiff was required to assert her discrimination claims during the administrative process at the University by filing a petition for writ of review, and that her failure to do so "bars her ability to now seek damages in federal court for discrimination." (*Id.* at 15). However, Defendant cites no legal authority for this proposition.

The Virgin Islands Writ of Review Statute, 5 V.I.C. §§ 1421-1423, provides the Superior Court of the Virgin Islands with jurisdiction to review administrative decisions and determinations. *See Gov't of the V.I. v. Crooke*, 54 V.I. 237, 266 (V.I. 2010) ("The Superior Court's general authority to review a decision of an administrative agency pursuant to a petition for writ of review derives from title 5, section 1421 of the Virgin Islands Code."). Section 1421 of the Virgin Islands Code provides, in relevant part, that "[a]ny party to any proceeding before or by any officer, board, commission, authority, or tribunal may have the decision or determination thereof reviewed for errors therein as prescribed in this chapter and rules of court." 5 V.I.C. § 1421. Section 1422 further provides:

> The writ of review shall be allowed in cases where there is no appeal or other plain, speedy, and adequate remedy, and where the officer, board, commission, authority, or tribunal in the exercise of his or its functions appears to have exercised such functions erroneously, or to have exceeded his or its jurisdiction, to the injury of some substantial right of the plaintiff.

*Id.* at § 1422. Plaintiff in the instant action is not challenging an administrative determination in this case. Therefore, the Virgin Islands Writ of Review Statute is inapplicable to the proceedings brought in this Court.

### 3.   Constructive Discharge

In its Motion for Summary Judgment, Defendant argues that "Plaintiff cannot prevail on a claim of constructive discharge against the University because she cannot establish that the University knowingly permitted conditions of discrimination so intolerable that a reasonable person subject to them would resign." (Dkt. No. 85 at 16). The Court agrees that Plaintiff's constructive discharge claim cannot survive summary judgment.[19]

To establish constructive discharge, "the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 n.4 (3d Cir. 2006). A plaintiff must further show that "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Mandel*, 706 F.3d at 169 (quoting *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1084 (3d Cir. 1996) (internal quotation marks omitted)). In other words, the plaintiff must show that the alleged discrimination goes beyond a "threshold of intolerable conditions." *Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 169 (3d Cir. 2001) (internal quotation marks omitted).

"[I]ntolerability . . . is assessed by the objective standard of whether a reasonable person in the employee's position would have felt compelled to resign—that is, whether he would have had no choice but to resign." *Connors v. Chrysler Financial Corp.*, 160 F.3d 971, 976 (3d Cir. 1998) (citation, internal quotation marks, and alteration omitted). In *Goss v. Exxon Office Systems Company*, 747 F.2d 885 (3d Cir. 1984), the seminal constructive discharge case in the Third

---

[19] Defendant also argues that this case is similar to *Smith v. Virgin Islands Port Authority*, 2009 U.S. Dist. LEXIS 98251 (D.V.I. 2009), where the district court dismissed the plaintiff's constructive discharge claim after finding that the plaintiff "stayed on the job for nearly two additional weeks after she resigned" and "did not complain about [her supervisor's] conduct until the effective date of her resignation." *Id*. at *13. The Court finds the facts of *Smith* distinguishable from the facts of this case. While the plaintiff in *Smith* did not complain about her supervisor's conduct until the effective date of her resignation, in this case, there is evidence that Plaintiff, along with several other members of the faculty, filed a "vote of no confidence" alleging discriminatory conduct by Dr. Jackson and Dr. Howard well before she resigned. (*See* Section I.B, *supra*).

Circuit, the Court held that the objective standard had been met where: a female sales representative was verbally abused by her supervisor about her decision to become pregnant; her employer assigned her sales territory to a male representative—despite her successful performance—after she took sick leave as a result of a miscarriage; and attempts to pursue remedies in-house resulted in an ultimatum from her employer that she either accept the new assignment or resign. *Id.* at 888-89; *see also Stremple v. Nicholson*, 289 F. App'x 571 (3d Cir. 2008) (finding constructive discharge after the plaintiff "suffered 'a slow degradation of his responsibilities, status, and authority'"; his supervisors showed "efforts to force his resignation," made ageist statements, and relocated his office; and his "transfer was considered a demotion (or even a firing) by other doctors").

Here, even viewing the evidence in the light most favorable to Plaintiff, the Court does not find that the conditions at the University were so intolerable that a reasonable person facing the same conditions would have felt forced to resign. First, the alleged incidents of discrimination described by Plaintiff—including, unfavorable work assignments, rude and degrading e-mails, denial of reimbursement for supplies, changes in course schedules, threat of termination, and a verbal reprimand—indicate that Plaintiff may have endured a stressful and frustrating working environment. However, "employees are not guaranteed stress-free environments and [] discrimination laws 'cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting.'" *Connors*, 160 F.3d at 976 (quoting *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1083 (3d Cir. 1992)); *see also Duffy*, 265 F.3d at 170 ("[A] stressful [work] environment does not amount to constructive discharge.").

Plaintiff's assertion that "she was to be targeted next for denial of tenure as a result of [] discrimination and retaliation" (Dkt. No. 1 at 11; Compl. ¶ 52; *see also* Dkt. No. 105-3 at 9; Kantz Dep. Tr. 191:5-7), does not alter the Court's conclusion. The Third Circuit has made clear that

"[t]he law of constructive discharge is not concerned with subjective fears of possible future dismissal." *Tunis v. City of Newark*, 184 F. App'x 140, 143 (3d Cir. 2006) (citing *Gray*, 957 F.2d at 1082); *see also Gray*, 957 F.2d at 1083 ("'[T]he law does not permit an employee's subjective perceptions to govern a claim of constructive discharge.'") (quoting *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985)). Therefore, Plaintiff's subjective fear that she was to be targeted next for denial of tenure cannot serve as justification for her constructive discharge claim.

Finally, Plaintiff's own explanation for her decision to resign supports the Court's conclusion that she was not constructively discharged. In her EEOC affidavit, Plaintiff states that she resigned from her position at the University "in order to not ruin her career in teaching" (Dkt. No. 85-1 at 29; ¶ 40), apparently based on her assumption that "she was to be targeted next for denial of tenure" (Dkt. No. 1 at 11; Compl. ¶ 52). The Third Circuit has explained, however, that:

> "Intolerability" is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign; presumably every resignation occurs because the employee believes that it is in his best interest to resign. Rather, "[i]ntolerability . . . is assessed by the objective standard of whether 'a reasonable person' in the employee's position would have felt *compelled* to resign,"–that is, whether he would have had no choice but to resign.

*Connors*, 160 F.3d at 976 (emphasis in original) (quoting *Blistein v. St. John's College*, 74 F.3d 1459, 1468 (4th Cir. 1996)). Here, while Plaintiff *chose* to resign based on her view that it was best for her career in light of her subjective fear of what might befall her, Plaintiff has not established that her working environment was so objectively intolerable that a reasonable person in her position would have felt *compelled* to resign.[20] Accordingly, the Court will grant Defendant's Motion for Summary Judgment on Plaintiff's constructive discharge claim.

---

[20] Indeed, it is worthy of note that the grievances that Plaintiff filed with the University complaining of unfavorable treatment were resolved almost entirely in her favor on the merits, with corresponding grants of relief.

### 4. Hostile Work Environment

In her Opposition to Defendant's Motion for Summary Judgment, Plaintiff asserts that she alleged a hostile work environment claim in the Complaint. (*See* Dkt. No. 110 at 24).[21] To establish a racially hostile work environment under Title VII, a plaintiff must prove:

> (1) that she suffered intentional discrimination because of her race; (2) that the discrimination was pervasive and regular; (3) that the discrimination detrimentally affected the plaintiff; (4) that the discrimination would have detrimentally affected a reasonable person of the same race as the plaintiff, in like position; and (5) a basis for respondeat superior liability.

*Page v. City of Pittsburgh*, 114 F. App'x 52, 54 (3d Cir. 2004) (citing *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 (3d Cir. 1999)). The fifth element of a hostile work environment claim relates to employer liability for the allegedly discriminatory conduct. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (citation omitted).

"The basis of an employer's liability for a hostile work environment claim depends on whether the harasser is the victim's supervisor or coworker." *Id.*; *see also Vance v. Ball State University*, 133 S. Ct. 2434, 2443 (2013). If the harasser is the victim's co-worker, "the employer is liable only if it was negligent in controlling working conditions." *Vance*, 133 S. Ct. at 2439. If, however, the harasser is the victim's supervisor and the harassment culminates in a "tangible employment action," the employer is "strictly liable." *Id.* If no "tangible employment action" is taken by the supervisor, the employer "may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or

---

[21] In a reply in support of a supplemental filing, Defendant appears to argue for the first time—without putting forth any reasoning or analysis—that Plaintiff has failed to establish "as a preliminary matter" that her hostile work environment claim is "viable and entitled to judicial consideration." (Dkt. No. 122 at 1). Because Defendant has not adequately addressed the viability of Plaintiff's hostile work environment claim, the Court will not consider that issue. *See Lanzotti*, 205 F.3d at 957 ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).");  *Zannino*, 895 F.2d at 17 ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

corrective opportunities that the employer provided." *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)). This defense is known as the "*Faragher/Ellerth* defense." *See Jones v. SEPTA*, 796 F.3d 323, 328 (3d Cir. 2015).

In the instant case Plaintiff has sued her employer, the University of the Virgin Islands, alleging that her supervisors, Dr. Jackson, Dr. Howard, Provost Musah, and the then President of the University, Dr. LaVerne E. Ragster ("President Ragster"), created a racially hostile work environment in violation of Title VII. (*See* Dkt. No. 117 at 2). Defendant asserts that it cannot be held "vicariously liable" for the allegedly harassing actions of Dr. Jackson, Dr. Howard, or Provost Musah because these individuals were not Plaintiff's supervisors, as defined by the Supreme Court in *Vance*, for purposes of respondeat superior liability. (*See* Dkt. Nos. 114, 122).[22] Alternatively, Defendant invokes the *Faragher-Ellerth* affirmative defense, arguing that even if Dr. Jackson, Dr. Howard, and Provost Musah were Plaintiff's supervisors, Defendant is shielded from liability because Defendant "exercised reasonable care to prevent and correct any harassing behavior" and Plaintiff "unreasonably failed to take advantage of the preventive or corrective opportunities" that Defendant provided, including the "internal grievance mechanisms." (Dkt. No. 114 at 10).

In response, Plaintiff contends that Defendant is "strictly liable for work place harassment" because Dr. Jackson, Dr. Howard, and Provost Musah all "had the power to take tangible employment action against her and did in fact do so[.]" (Dkt. No. 117 at 2). Plaintiff contends further that the *Faragher-Ellerth* affirmative defense is inapplicable in this case. Specifically, she

---

[22] Defendant does not address whether President Ragster was a supervisor for purposes of respondeat superior liability. Instead, it appears to concede that President Ragster had the authority to take tangible employment actions against Plaintiff. (*See* Dkt. No. 122 at 7 (stating that the President of the University has the power to decide matters relating to promotion, leaves of absence, and termination)). Because Defendant does not include President Ragster in its argument, the Court will not address her role herein. *See Lanzotti*, 205 F.3d at 957 ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)."); *Zannino*, 895 F.2d at 17 ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

argues that, even if Defendant is not strictly liable, "the evidence abundantly shows that [Defendant] did not take any steps or use any care to stop the racially hostile work environment perpetrated by Drs. Jackson, Howard, and Provost Musah" and that "the evidence reveals that Defendant failed to have any . . . preventive or corrective measures in place for Plaintiff to utilize." (*Id.* at 13).

Applying *Vance* and its progeny to this case, the Court finds that there are factual issues in dispute that prevent the Court from concluding as a matter of law that Dr. Jackson and Provost Musah were not Plaintiff's "supervisors." Specifically, there are genuine issues of material fact as to whether Dr. Jackson and Provost Musah had the authority to recommend and influence tangible employment actions against Plaintiff. There are also genuine issues of material fact as to whether in fact a tangible employment action was taken against Plaintiff. Summary judgment is also not warranted because Defendant has not established the first prong of the *Faragher-Ellerth* affirmative defense as a matter of law—i.e., that "the employer exercised reasonable care to prevent and correct any harassing behavior." *Vance*, 133 S. Ct. at 2439. Accordingly, the Court will deny Defendant's Motion for Summary Judgment on Plaintiff's hostile work environment claim that is grounded in the contention that respondeat superior liability cannot be established.

### a.  Supervisory Status

In *Vance*, a Title VII race-based harassment case, the Supreme Court held that an employee is a "supervisor" for purposes of vicarious liability under Title VII if he or she is empowered by the employer to "take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" 133 S. Ct. at 2443 (quoting *Ellerth*, 524 U.S. at 761). An employee need not, however, "have the final say as to the tangible employment action; instead, the employee's decision may be 'subject to

approval by higher management.'" *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015) (en banc) (quoting *Vance*, 133 S. Ct. at 2446 n.8); *see also Kramer v. Wasatch County Sheriff's Office*, 743 F.3d 726, 738 (10th Cir. 2014). In *Vance*, the Supreme Court explained that, "even if an employer concentrates all decision-making authority in a few individuals . . . those individuals will have a limited ability to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employee." *Vance*, 133 S. Ct. at 2452. Thus, an employee "who works closely with his or her subordinates and who has the power to *recommend* or otherwise substantially influence tangible employment actions, and who can thus indirectly effectuate them, also qualifies as a 'supervisor' under Title VII." *Kramer*, 743 F.3d at 738 (citing *Vance*, 133 S. Ct. at 2452) (emphasis in original).

This interpretation of "supervisor" adopted in *Vance* is consistent with the Supreme Court's decision in *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), wherein the Court held that "if a supervisor performs an act motived by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable" even if the ultimate decision maker is not motivated by such discriminatory animus. *Id*. at 422 (footnote omitted) (emphasis in original). In so holding, the Court explained that "[a]n employer's authority to reward, punish, or dismiss is often allocated among multiple agents. The one who makes the ultimate decision does so on the basis of performance assessments by other supervisors." *Id*. at 420. Accordingly, under these circumstances, an employer "may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." *Vance*, 133 S. Ct. at 2452 (citing *Ellerth*, 524 U.S. at 762).

The evidence in the record, when viewed in the light most favorable to Plaintiff, contains sufficient facts from which a reasonable jury could conclude that Dr. Jackson and Provost Musah

were empowered by Defendant to recommend and influence tangible employment actions against Plaintiff.[23] For example, the Faculty Policy Manual, which provides the procedure for obtaining employment with tenure at the University, states, in relevant part:

> The initial review for the granting of tenure will be done by the Faculty Review Advisory Committee (FRAC). . . . The recommendations of FRAC will be transmitted to the Provost . . . .
>
> The Provost will engage in a separate review of tenure candidates after receiving the recommendations of FRAC. In making his/her recommendation to the President, the Provost shall consult with the division Chair of each candidate under review, and with members of the University community or of the candidate's academic discipline who are qualified to evaluate the candidate's record.
>
> The Provost shall forward his or her recommendations, along with those of FRAC, to the President who will then forward to the Board of Trustees the names, records, the results of the evaluations, and his/her recommendations, including those that are negative . . . . The final decision in each case will be made by the Board of Trustees.

(Dkt. No. 114-1 at 2-3 (2003 Faculty Policy Manual, p. 7-8)).

Although Defendant acknowledges that the tenure review process at the University includes recommendations from, *inter alia*, the Division Chair of each tenure candidate and the Provost (Dkt. No. 122 at 6, 7), it argues that "[t]here is simply no evidence in the record that the Board of Trustees' power to make decisions concerning tenure . . . [is] exercised in a ministerial manner such that any tangible employment decisions flowing from the use of that power may be imputed to a subordinate." (*Id*. at 7). Plaintiff is not required, however, to establish that the Board of Trustees would follow recommendations from the Division Chair or the Provost "blindly." *Kramer*, 743 F.3d at 741. Even if the Board of Trustees undertakes an independent analysis when considering tenure, there are genuine issues of material fact regarding whether the Division Chair and the Provost have "substantial input" into the tenure decision. *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 509 (7th Cir. 2004) (cited approvingly in *Vance*, 133 S. Ct. at 2452).

---

[23] As will be discussed below, the Court does not so find with regard to Dr. Howard.

Accordingly, the fact that the Board of Trustees makes the "final decision" on tenure does not absolve Defendant from liability as a matter of law.[24]

In support of its argument that Dr. Jackson was not Plaintiff's supervisor, Defendant contends that "division [C]hairs merely provide 'direction and assistance' to faculty members, but are not the final decision makers on issues of promotion and tenure, nor are they authorized in any respect to make termination decisions at the University." (Dkt. No. 122 at 4). Again, the mere fact that Division Chairs are not "the final decision makers" on issues of promotion, tenure, or termination is not dispositive. There is evidence in the record that Division Chairs—like Dr. Jackson—have the power to make recommendations regarding tangible employment actions, upon which Defendant relies. (*See e.g.*, Dkt. No. 114-2 at 2 (University Human Resources Policy Manual) ("Managers may recommend, but may not authorize or take, action to suspend without the President's prior approval."). Further, there is also evidence in the record that Division Chairs are responsible for writing performance evaluations (*see* Dkt. No. 85-2 at 6-8 ("Classroom Observation Appraisal Form," providing for the "Chairperson's signature")), which, as Defendant acknowledges, influence advancement in salary and promotion in rank (*see* Dkt. No. 122 at 5; *see also* Dkt. No. 106-24 at 1). Accordingly, the evidence of record creates genuine issues of material fact concerning whether Dr. Jackson was a "manager who work[ed] closely with [Plaintiff] and who ha[d] the power to recommend or otherwise substantially influence tangible employment actions, and . . . thus indirectly effectuate them[.]" *Kramer*, 743 F.3d at 738.[25]

---

[24] Defendant also argues that Plaintiff has not "presented any evidence . . . to support her contention that the University President[] exercised any power given to [her] by the Faculty Policy Manual without independent discretion." (Dkt. No. 122 at 7-8). For the reasons stated above, the Court finds this argument is also without merit. *See Kramer*, 743 F.3d at 741.

[25] In *Kramer*, the Tenth Circuit found a genuine issue of fact where the alleged harasser was "the sole person responsible for writing [the plaintiff's] performance evaluations, and that those evaluations could cause [the plaintiff] to be promoted, demoted, or fired." 743 F.3d at 739, 741.

In view of the foregoing, Plaintiff has raised genuine issues of material fact as to whether Defendant "effectively delegated" to Dr. Jackson and Provost Musah the power to take tangible employment actions against Plaintiff by relying on recommendations from Division Chairs and the Provost when making decisions regarding tenure, promotion, suspension, and termination. *See Vance*, 133 S. Ct. at 2452.[26] Accordingly, the Court cannot conclude as a matter of law that Dr. Jackson and Provost Musah were not Plaintiff's supervisors, as that term is defined in *Vance*.

Dr. Howard, however, presents a different situation. There is no evidence in the record—and Plaintiff points to none—which suggests that Defendant empowered Dr. Howard, the former Assistant Chairperson of the Division, to take tangible employment actions against Plaintiff. Accordingly, the Court finds as a matter of law that Dr. Howard was not Plaintiff's supervisor as that term is defined by the Supreme Court in *Vance*.[27]

### b.  Tangible Employment Action

If Dr. Jackson and Provost Musah were Plaintiff's supervisors within the meaning of *Vance*, Defendant is strictly liable for the creation of a hostile work environment only if the conduct of Dr. Jackson and Provost Musah culminated in a tangible employment action. *See Vance*, 133 S. Ct. at 2439 (citing *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765). Defendant contends that this case "**does not** involve a tangible employment action against [Plaintiff]." (Dkt. No. 114 at 7 (emphasis in original)). Specifically, Defendant states that "Plaintiff was not fired,

---

[26] *See also Bumbarger v. New Enter. Stone & Lime Co.*, 2016 U.S. Dist. LEXIS 34588, at *77 (W.D. Pa. Mar. 17, 2016) (finding the defendant "concentrate[d] all decisionmaking authority in a few individuals" but had also "effectively delegated the power to take tangible employment actions" to the alleged harasser on whose recommendations it relied); *Cacciola v. Work N Gear*, 23 F. Supp. 3d 518, 530 (E.D. Pa. 2014) (finding respondeat superior liability where the harasser could "recommend" termination but did not "have the authority singly to terminate").

[27] In view of the Court's findings in this regard, Defendant is potentially liable for the creation of a hostile work environment as it relates to the actions of Dr. Howard only "if it was negligent in controlling [Plaintiff's] working conditions." *Vance*, 133 S. Ct. at 2439. As discussed below, Defendant is not entitled to summary judgment on this latter issue. *See* Section III.B.4.c, *infra*. Accordingly, notwithstanding the Court's grant of summary judgment in favor of Defendant on Dr. Howard's supervisory status, summary judgment is nevertheless denied as to Plaintiff's hostile work environment claim as it relates to any alleged discriminatory conduct of Dr. Howard. *See* p. 34, *infra*.

nor was she suspended, demoted, transferred out of her division or subject to any reduction in employment benefits by the University." (*Id*.). Plaintiff asserts otherwise, arguing that the following constitute tangible employment actions: (1) the alleged decrease in her course load and teaching responsibilities; (2) the alleged denial of her request to teach summer classes; (3) the alleged reduction in her number of student advisees; (4) an alleged statement to her former student advisees that she is incompetent; and (5) her alleged constructive discharge. (*See* Dkt. No.117 at 2). For the reasons stated below, the Court finds that Plaintiff has raised a genuine issue of material fact as to whether she suffered tangible employment actions.

A "tangible employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance*, 133 S. Ct. at 2442 (quoting *Ellerth*, 524 U.S. at 761). Economic injury is almost always sufficient to create a tangible employment action. *See Kramer*, 743 F.3d at 738. However, it is not always necessary. *See id*. (citing *Ellerth*, 524 U.S. at 762 ("A tangible employment action *in most cases* inflicts direct economic harm.") (emphasis in *Kramer*). The Tenth Circuit has explained:

> [A] tangible employment action can include not just the obvious firing or demoting, but also giving an employee a less distinguished title [or actions resulting in] a material loss of benefits, significantly diminished material responsibilities, or other indicies that might be unique to a particular situation. However, neither a bruised ego nor a demotion *without* a concurring change in pay, benefits, duties, or prestige is enough.

*Id*. at 738-39 (internal citations and quotation marks omitted) (emphasis in *Kramer*).

As an initial matter, the Court has concluded as a matter of law, that Plaintiff was not constructively discharged from the University. *See* Section III.B.3, *supra*. Because there is no viable constructive discharge claim, such a claim cannot be deemed to constitute a tangible employment action under the circumstances here. With respect to the remaining actions that Plaintiff contends are tangible employment actions—i.e., the alleged reduction in Plaintiff's course

load, teaching responsibilities, and student advisees, the alleged denial of Plaintiff's request to teach summer courses, and the alleged statement to her former student advisees that she is incompetent—the Court finds that there are genuine issues of material fact as to whether these alleged actions adversely affected Plaintiff's "pay, benefits, duties, or prestige." *Kramer*, 743 F.3d at 739.

During her deposition, Plaintiff testified that in addition to her annual base salary she received additional compensation for teaching beyond twelve credits per semester (also known as "overload" courses), teaching summer classes, and performing administrative tasks. (*See* Dkt. No. 105-1 at 10; Kantz Dep. Tr. 33:7-12; 34:18-20, 24-25; 35:1-11; 40:7-11). There is also evidence in the record that, upon learning that Dr. Jackson scheduled her to teach only one class—that had been cancelled—during the fall 2007 semester, Plaintiff reported the change in responsibilities in an e-mail dated March 13, 2007 to Provost Musah and John Sokolski ("Mr. Sokolski"), then Director of Human Resources at the University, and noted that she "hold[s] a full time, tenure track contract through May 2008." (Dkt. No. 106-1 at 1). Based on the foregoing, the Court finds that Plaintiff has presented sufficient evidence to create genuine issues of material fact as to whether she suffered tangible employment actions.

### c.  Faragher-Ellerth Affirmative Defense

Even absent a tangible employment action, if either Dr. Jackson or Provost Musah qualify as Plaintiff's supervisor, Defendant may still be vicariously liable for their alleged creation of a hostile work environment if Defendant is unable to establish the *Faragher-Ellerth* affirmative defense. *See Vance*, 133 S. Ct. at 2439 (citing *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765). Defendant is also potentially liable for the creation of a hostile work environment as it relates to the actions of Dr. Howard if it is unable to establish the elements of the *Faragher-Ellerth* affirmative defense. *Id*.; *see also* n.27, *supra*.

32

The *Faragher-Ellerth* defense "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any [] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807-08. Defendant bears the burden of proving both elements of the defense by a preponderance of the evidence. *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 146 (2004); *see also Faragher*, 524 U.S. at 807-08.

The Tenth Circuit has explained the showing required for summary judgment under the *Faragher-Ellerth* defense:

> To win summary judgment on the *Faragher/Ellerth* defense, an employer must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. The defendant must demonstrate that no disputed material fact exists regarding the affirmative defense asserted when the evidence is viewed in the light most favorable to the plaintiff.

*Kramer*, 743 F.3d at 746 (internal citations, quotation marks, and alterations omitted). Here, Defendant has not satisfied its burden of demonstrating that no disputed material fact exists regarding its assertion that it exercised reasonable care to prevent and correct any harassing behavior through its "internal grievance mechanisms." (*See* Dkt. No. 114 at 10-12).

In her response to Defendant's *Faragher-Ellerth* defense, Plaintiff argues that "Defendant did not have a specified grievance procedure in place in 2006-2007 that Plaintiff could utilize to have her complaints against Dr. Jackson heard." (Dkt. No. 117 at 13). Plaintiff explains that she "could not operate under the grievance procedure in the Faculty Policy Manual (FPM) from 2003 as the University had restructured and the manual was obsolete." (*Id.*). Plaintiff explains further that the Faculty Policy Manual "was not revised and approved by the Board of Trustees until November 2008." (*Id.*). According to Plaintiff, prior to November 2008, "every grievance was handled differently and [] the grievance policy in the Faculty Policy Manual was not being

followed." (*Id.*; *see also* Dkt. No. 105-2 at 10-11; Kantz Dep. Tr. 114:23-25; 115:1-3; 118:11-25; 119:1-10).

These representations by Plaintiff are consistent with the deposition testimony of President Ragster (Dkt. No. 105-7 at 49-53), Provost Musah (Dkt. No. 105-8 at 71-72), and Dr. Utha O. Williams, Interim Executive Director for Global and Graduate Education at the University, (Dkt. No. 106-21 at 6-7). Defendant has not presented any evidence to rebut Plaintiff's showing that there are disputed facts as to whether Defendant had procedures in place to prevent and correct harassing behavior. Accordingly, Defendant has not satisfied its burden of demonstrating that it is entitled to judgment as a matter of law under the *Faragher-Ellerth* defense.[28]

For all of the reasons set forth *supra*, the Court will deny Defendant's Motion for Summary Judgment on Plaintiff's hostile work environment claim that is premised on the contention that Plaintiff cannot establish the existence of respondeat superior liability.

### 5.   Virgin Islands Civil Rights Act

In addition to Title VII, Plaintiff also alleges that Defendant violated 10 V.I.C. § 61, *et seq.* and 24 V.I.C. § 451 of the Virgin Islands Civil Rights Act ("VICRA"). (Dkt. No. 1 at 12; Compl. ¶ 60). Defendant moves for summary judgment on this claim, arguing that Plaintiff "never identified what provision in either Title 10 or Title 24 of the Virgin Islands Code she [is] relying upon," and that there is no private cause of action under either 10 V.I.C. § 64 or 24 V.I.C. § 451. (Dkt. No. 122 at 10-11). In the event that the Court finds a private cause of action under the VICRA, Defendant asserts that the arguments advanced in support of its motion for summary judgment on Plaintiff's Title VII claims apply with equal force to her VICRA claims. (*Id.* at 11).

---

[28] Because the Court has concluded that Defendant failed to satisfy its burden of proving the first element of the *Faragher-Ellerth* defense, the Court need not reach the second element.

In her Complaint, Plaintiff alleges that Defendant is in violation of 10 V.I.C. § 61, *et seq.* and 24 V.I.C. § 451 of the VICRA, which "prohibit discrimination based on race, color or national origin." (Dkt. No. 1 at 12; Compl. ¶ 60). Defendant is correct that courts have found no private cause of action under 10 V.I.C. § 64. *See Miller v. Virgin Islands Hous. Auth.*, 2005 U.S. Dist. LEXIS 11146, at *14-16, 46 V.I. 623 (D.V.I. June 3, 2005) (citing *Figueroa v. Buccaneer*, 188 F.3d 172, 177-81, 41 V.I. 502 (3d Cir. 1999)). However, the Supreme Court of the Virgin Islands recently ruled in *Rennie v. Hess Oil Virgin Islands Corporation*, 62 V.I. 529 (V.I. 2015), that there is, and has always been, a private cause of action under 24 V.I.C. § 451. *See id.* at 547-50. Accordingly, Plaintiff's VICRA claims are properly before the Court.[29]

Further, while in *Galloway v. Islands Mechanical Contractor, Inc.*, 2012 U.S. Dist. LEXIS 129014, at *49 (D.V.I. Sept. 11, 2012), the Court found no reason to apply different standards when evaluating Title VII and VICRA claims, the Supreme Court of the Virgin Islands has found otherwise. In *Rennie*, the Supreme Court found that the Virgin Islands Civil Rights Act is "significantly broader in scope than the federal Civil Rights Act," and observed that it "predates the adoption of the federal Civil Rights Act . . . by nearly a decade." 62 V.I. at 551-52. The Supreme Court went on to note that "it is not clear why . . . any [] case interpreting the federal Civil Rights Act[] is of any assistance in interpreting the Virgin Islands Civil Rights Act." *Id.* at 552. Because the VICRA is a local statute, the Court is required to follow the view of the Supreme Court on this issue.

Here, Defendant imports the same arguments it advanced in connection with Plaintiff's Title VII claims to Plaintiff's VICRA claims. However, in view of the Supreme Court's recent

---

[29] In her Opposition to Defendant's Motion for Summary Judgment, Plaintiff cites and argues that Defendant violated 10 V.I.C. §§ 1-11. (Dkt. No. 110 at 27). Courts in the Virgin Islands have always recognized a private cause of action under 10 V.I.C. §§ 3 and 7. *See Rennie*, 62 V.I. at 551 (citing *Figueroa v. Buccaneer*, 188 F.3d 172, 178, 41 V.I. 502 (3d Cir. 1999)).

caution in *Rennie* regarding the use of the jurisprudence developed under federal law to interpret the local Civil Rights Act, the Court cannot analyze Plaintiff's VICRA claims by simply assuming that the same legal principles that govern her Title VII claims apply to her local claims. Because Defendant has not argued or cited any Virgin Islands case authority that sets forth the legal or evidentiary standard for determining what constitutes a viable claim under the VICRA, or conducted any analysis to determine what the law should be, the Court, on this record, cannot grant Defendant summary judgment on Plaintiff's VICRA claims. The Court will, however, allow further briefing on the viability of Plaintiff's VICRA claims in view of the fact that the *Rennie* decision post-dated the summary judgment briefing in this case.

### 6. Defamation[30]

The Supreme Court of the Virgin Islands "has adopted the basic elements for a claim of defamation set forth in the Second Restatement of Torts." *Joseph v. Daily News Publishing Co.*, 57 V.I. 566, 585-86 (V.I. 2012) (citing *Kendall v. Daily News Pub. Co.*, 55 V.I. 781, 787 (V.I. 2011)). To prevail on a claim of defamation under Virgin Islands law, a plaintiff must show: "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Chapman v. Cornwall*, 58 V.I. 431, 444 (V.I. 2013) (quoting *Kendall*, 55 V.I. at 787). The plaintiff must also specifically identify "what alleged defamatory statements were made, including who made them, and to whom the statements were made." *Bethea v. Merchants*

---

[30] Count II of the Complaint alleges both "defamation and slander." (*See* Dkt. No. 1 at 12). However, slander is the verbal form of defamation. *See 12th Street Gym, Inc. v. General Star Indem. Co.*, 93 F.3d 1158, 1163 (3d Cir. 1996) ("Slander and libel are both forms of defamation; slander is defamation by words spoken, and libel is defamation by written or printed material.") (citations omitted)). Therefore, the Court will refer to Plaintiff's "defamation and slander" claim as one for defamation.

36

*Commercial Bank*, 2014 U.S. Dist. LEXIS 124764, at *59 (D.V.I. Sept. 8, 2014 (citing *Smith v. V.I. Port Authority*, 2010 U.S. Dist. LEXIS 32534, at *54 (D.V.I. Mar. 31, 2010)).

A statement is only defamatory "if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Greene v. V.I. Water and Power Auth.*, 2011 U.S. Dist. LEXIS 80325, at *30 (D.V.I. July 22, 2011) (quoting RESTATEMENT (SECOND) OF TORTS § 559); *see also Joseph*, 57 V.I. at 586. "A disparaging remark that tends to harm someone in his business or profession is actionable irrespective of harm as such a remark falls within the definition of slander or defamation per se." *Illaraza v. Hovensa, LLC*, 2010 U.S. Dist. LEXIS 77402, at *13 (D.V.I. July 30, 2010) (citing *VECC, Inc. v. Bank of Nova Scotia*, 296 F. Supp. 2d 617, 623 (D.V.I. 2003)). Statements that are deemed to harm an individual's business or professional reputation either "impugn the integrity of the individual with respect to their job performance" or "attack the competence or skill of the employee in carrying out his or her duties." *Wilson v. V.I. Water & Power Auth.*, 2010 U.S. Dist. LEXIS 129229, at * 19 (D.V.I. Dec. 7, 2010) (citing *VECC, Inc.*, 296 F. Supp. 2d at 623).

In the instant case, Plaintiff asserts that Dr. Howard told Plaintiff's former student advisees that she was no longer their advisor because she was "incompetent." (Dkt. No. 85-6 at 12). Defendant argues that this statement is "a mere opinion and not actionable as a defamatory statement." (Dkt. No. 85 at 20). Defendant further argues that "there is no evidence in the record whatsoever other than [Plaintiff's] self-serving statements that Dr. Howard ever made such a statement," and that Plaintiff is unable "to identify in [the] record a third party to whom Dr. Howard allegedly published the allegedly false statement." (*Id*. at 20-21). Based on the record, the

Court cannot conclude as a matter of law that the alleged statement that Plaintiff was "incompetent" is not defamatory.[31]

Although it is true that "an opinion without more does not create a cause of action in [defamation], . . . '[a] defamatory communication may consist of a statement in the form of an opinion, . . . if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.'" *Callender v. Nichtern*, 32 V.I. 96, 101-02 (V.I. Terr. Ct. 1995) (quoting RESTATEMENT (SECOND) TORTS §566) (second and third alteration in *Callender*)); *see also Bethea v. Merchants Commercial Bank*, 2012 U.S. Dist. LEXIS 115039, at *4 (D.V.I. Aug. 15, 2012). The Third Circuit has explained:

> Although there may be no such thing as a false opinion, an opinion which is unfounded reveals its lack of merit when the opinion-holder discloses the factual basis for the idea. If the disclosed facts are true and the opinion is defamatory, a listener may choose to accept or reject it on the basis of an independent evaluation of the facts. However, if an opinion is stated in a manner that implies that it draws upon unstated facts for its basis, the listener is unable to make an evaluation of the soundness of the opinion.

*Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 972 (3d Cir. 1985) (quoted affirmatively in *Kendall v. Daily News Publishing Co.*, 53 V.I. 250, 263-64 (V.I. Super. Ct. 2010)). Assuming—without deciding—that the alleged statement of Dr. Howard is an opinion, it draws on unstated facts, thereby rendering the underlying basis for the opinion unknown. Therefore, it would be premature to rule as a matter of law that Plaintiff cannot establish a valid claim for defamation. *See, e.g.*, *Bethea*, 2012 U.S. Dist. LEXIS 115039, at *7 (finding statements that plaintiff was "incompetent and negligent in performing his duties" reflected negatively on his integrity and capacity to perform his duties as a loan executive and were therefore defamatory per se).

---

[31] The Court notes that Plaintiff did not respond to Defendant's defamation argument in her Opposition. Nonetheless, the Court finds that Defendant is not entitled to summary judgment on this claim.

Further, Defendant's contention notwithstanding, there are factual issues as to whether Dr. Howard made and published the statement that Plaintiff was "incompetent." During her deposition, Plaintiff testified that Dr. Howard made the statement to at least 10 to 15 of her student advisees on St. Thomas, including "Nicole Durgadeen" and "Sarah." (Dkt. No. 85-6 at 13-14; Kantz Dep. Tr. 220:6-25; 221:1-20). Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in favor of Plaintiff, *see Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 819 (3d Cir. 2006) (citations omitted), the Court concludes that a jury could reasonably find that the alleged statement of Dr. Howard was made and published to at least two of Plaintiff's student advisees. Therefore, the Court cannot grant Defendant summary judgment on the basis that the alleged statement of Dr. Howard was not made or published to a third party.

Defendant also argues that Plaintiff has failed to meet her burden of proving that the statement by Dr. Howard caused her harm. (*See* Dkt. No. 85 at 21). Defendant contends that Plaintiff, "[w]hen asked during her deposition what loss she sustained as a result of the defamatory statement," stated that "she cannot quantify any monetary loss." (*Id*. (citing Dkt. No. 85-6 at 18; Kantz Dep. Tr. 225)). However, the Supreme Court of the Virgin Islands has explained that:

> Unlike other torts, [the] "special harm" assessment is not itself a calculation of damages. It is actually an element of the tort, the satisfaction of which must be established for there to be liability. Only after that liability is established does an assessment of actual damages become relevant.

*Joseph*, 57 V.I. at 588 n.11.

"Special harm" has been defined by the Supreme Court of the Virgin Islands as "the loss of something having economic or pecuniary value." *Id*. at 587 (quoting RESTATEMENT (SECOND) OF TORTS § 575, cmt. b). Thus, under Virgin Islands law, Plaintiff need only establish "the loss of something having economic or pecuniary value," not that she actually suffered monetary loss, in order to survive summary judgment. In addition, if Plaintiff establishes defamation per se—which has been found to exist in situations in which one's integrity and competency to perform one's

duties are impugned, *see Bethea*, 2012 U.S. Dist. LEXIS 115039, at *7—Defendant "is subject to liability without proof of special harm." *Sprauve v. CBI Acquisitions, LLC*, 2010 U.S. Dist. LEXIS 92604, at *37 n.9 (D.V.I. Aug. 31, 2010) (quoting Restatement (Second) of Torts § 573) (internal quotation marks omitted)). Accordingly, because Defendant's argument is grounded in the incorrect premise that a showing of monetary loss is required, Defendant has not established that it is entitled to judgment as a matter of law.

For the foregoing reasons, the Court will deny Defendant's Motion for Summary Judgment on Plaintiff's defamation claim that Dr. Howard allegedly told Plaintiff's student advisees that she was no longer their advisor because she was "incompetent."

Defendant also moves for summary judgment on Plaintiff's other claims of defamation— i.e., statements in an e-mail communication between Dr. Jackson and Dr. Howard wherein Dr. Howard wrote "these people" and "hypocrisy" (Dkt. No. 85-6 at 15; Kantz Dep. Tr. 222:10-12) and statements in an e-mail communication between Plaintiff and Dr. Linda Thomas, another faculty member within the Division of Education, that according to Plaintiff were "incredibly offensive" (*id.* at 16; Kantz Dep. Tr. 223:5-8). With respect to the first e-mail communication between Dr. Jackson and Dr. Howard, Defendant contends that summary judgment is warranted on this claim of defamation because Plaintiff, during her deposition, admitted that she does not know who Dr. Jackson and Dr. Howard were referring to when they wrote "these people," and because Plaintiff "just saw the email containing these references for the first time <u>after</u> the filing of her lawsuit." (Dkt. No. 85 at 19 (citing Dkt. No. 85-6 at 16; Kantz Dep. Tr. 223) (emphasis in original)).

Although Defendant is correct that Plaintiff stated during her deposition that the e-mail between Dr. Jackson and Dr. Howard "does not say" who they were referring to, she also stated that "[the e-mail was] related to an advising situation . . . that [she] was impacted by." (Dkt. No.

85-6 at 15; Kantz Dep. Tr. 222:15-18). To be actionable under Virgin Islands law, "a communication must be a misstatement of fact capable of defamatory meaning that is of and concerning the plaintiff." *Kendall*, 53 V.I. at 262-63 (citing RESTATEMENT (SECOND) OF TORTS § 614). Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in favor of Plaintiff, *see Doeblers'*, 442 F.3d at 819 (citations omitted), the Court concludes that a jury could reasonably find that the e-mail between Dr. Jackson and Dr. Howard concerned Plaintiff. Therefore, summary judgment is not appropriate. Summary judgment is also not appropriate on the basis that Plaintiff learned of the e-mail after the filing of the instant lawsuit. *See* FED. R. CIV. P. 15(b) (allowing a party to move at any time to amend the pleadings to conform to the evidence and to raise an unpleaded issue). Accordingly, the Court will deny Defendant's Motion for Summary Judgment on Plaintiff's claim that the e-mail between Dr. Jackson and Dr. Howard referring to "hypocrisy" and "these people" was defamatory.

As for the second e-mail communication between Plaintiff and Dr. Thomas, Plaintiff acknowledged during her deposition that the statements in the e-mail were not published to a third-party and therefore do not constitute defamation. (*See* Dkt. No. 85-6 at 17-18; Kantz Dep. Tr. 224:24-25, 225:1-2). Virgin Islands law requires publication of the defamatory statement to a third party. *See Chapman*, 58 V.I. at 444. Therefore, the Court will grant Defendant's Motion for Summary Judgment on Plaintiff's defamation claim that Dr. Thomas made "incredibly offensive" statements in an e-mail communication to Plaintiff.

In sum, the Court will deny Defendant's Motion for Summary Judgment on all but one of Plaintiff's defamation claims.

### 7. Punitive Damages

In Count V of the Complaint, Plaintiff seeks an award of punitive damages, alleging that "[t]he actions of the Defendant are so reprehensible and done with such a reckless disregard for

the rights of the Plaintiff as to entitle the Plaintiff to an award of punitive damages." (Dkt. No. 1 at 13; Compl. ¶ 73). Defendant argues that "Plaintiff's claim for punitive damages . . . must be dismissed as a matter of law" because the University of the Virgin Islands, "an autonomous instrumentality of the Government of the Virgin Islands," is exempt from the imposition of punitive damages. (Dkt. No. 85 at 22-23).

As an initial matter, "[i]t is well settled that a claim for punitive damages is not a distinct cause of action." *Prevost v. Islands Mech. Contr., Inc.*, 2013 U.S. Dist. LEXIS 36070, at * 3 n.2 (D.V.I. Mar. 15, 2013) (quoting *Galloway v. Islands Mech. Contr., Inc.*, 2012 U.S. Dist. LEXIS 129014, at *62 (D.V.I. Sept. 11, 2012) (internal quotation marks omitted)); *see also McDonald v. Davis*, 51 V.I. 573, 607 (D.V.I. 2009) (collecting cases). Therefore, the Court will grant Defendant's Motion for Summary Judgment on Plaintiff's punitive damages claim to the extent that Plaintiff seeks to create an independent cause of action for punitive damages.

Even if Plaintiff simply seeks punitive damages as a form of relief and not as an independent cause of action, summary judgment is nonetheless appropriate on Plaintiff's punitive damages claim under Title VII because Defendant, the University of the Virgin Islands, is an instrumentality of the Government of the Virgin Islands. *See* 17 V.I.C. § 451 ("There is hereby established in the Island of St. Thomas, Virgin Islands, as an instrumentality of the Government of the United States Virgin Islands an institution to be known as 'The University of the Virgin Islands[.]'"). As such, Defendant cannot be held liable for punitive damages under Title VII. *See* 42 U.S.C. § 1981a(b)(1) (providing that a Title VII complainant may recover punitive damages "against a respondent (other than a government, government agency or political subdivision)").

Similarly, under Virgin Islands law, punitive damages are generally not allowed against the Government of the Virgin Islands or its instrumentalities unless expressly authorized by statute. *See Concepcion v. Virgin Islands Hous. Auth.*, 47 V.I. 112, 116 (V.I. Super. Ct. 2005) (citing

*Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 261 (1980)); *see also Smith v. V.I. Port Authority*, 2008 U.S. Dist. LEXIS 67692, at *3 (D.V.I. Aug. 29, 2008). Neither the Virgin Islands Civil Rights Act, 10 V.I.C. §§ 1-10, nor the version of the Virgin Islands employment discrimination statute in effect at the time the complained-of conduct occurred in this case, 24 V.I.C. § 451, [32] expressly provide for punitive damages against the Government of the Virgin Islands or its instrumentalities. Accordingly, Defendant, an instrumentality of the Government of the Virgin Islands, cannot be held liable for punitive damages under the Virgin Islands Civil Rights Act or the Virgin Islands employment discrimination statute. *See Abney v. Univ. of the Virgin Islands*, 2016 U.S. Dist. LEXIS 59947, at *24-25 (D.V.I. May 3, 2016); *Turnbull v. Univ. of the Virgin Islands*, 2016 V.I.

---

[32] At the time the complained-of conduct occurred in this matter, section 451 of the Virgin Islands Civil Rights Act provided:

> (a)  Notwithstanding the provisions of any other law, it shall be [an] unlawful employment practice or unlawful discrimination:
>
> (1)  For an employer to refuse to hire or employ or to bar or discharge from employment, any individual because of his race, sex, age, religion, color or ancestry, provided that an employer may refuse to hire an individual for good cause relating to the ability of the individual to perform the work in question;
>
> (2)  For an employer to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment because of race, sex, age, religion, color or ancestry . . . .

24 V.I.C. § 451(a)(1)-(2) (prior to amendment by Act No. 7323, § 2(a) (V.I. Reg. Sess. 2011)). Section 462 further provided that for purposes of title 24 of the Virgin Islands Code, "the term 'employer' includes individuals, corporations, other legal entities, and all departments, offices, boards, institutions, branches, independent instrumentalities, and other agencies of the Government of the United States Virgin Islands." 24 V.I.C. § 462.

In 2011, the Virgin Islands Legislature amended section 451 to read, in relevant part: "In addition to other remedies, any person who has been discriminated against as defined in this section may bring an action for compensatory and punitive damages in any court of competent jurisdiction." 24 V.I.C. § 451(a). The definition of employer under section 462 remained the same.

Although the Supreme Court of the Virgin Islands has ruled that "even prior to the 2011 amendments," section 451 provided a private cause of action, *Rennie*, 62 V.I. at 550, the Court did not opine on the availability, under the prior version of section 451, of punitive damages against an instrumentality of the Virgin Islands Government. Nonetheless, based on the plain reading of the prior version of section 451, it did not provide for punitive damages. This Court must apply section 451 as it existed at the time the complained-of conduct occurred in this case. *See Thompson v. Thompson*, 2016 V.I. LEXIS 14, at *3 (V.I. Super. Ct. Feb. 19, 2016) ("A statute is presumed to be prospective only and will not be applied retroactively in the absence of clear legislative intent.") (citing *United States v. Sec. Indus. Bank*, 459 U.S. 70, 79 (1982) (other citation omitted)); *see also Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) ("[T]he presumption against retroactive legislature is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic.").

LEXIS 22, at *20-21 (V.I. Super. Ct. Mar. 2, 2016); *see also Codrington v. V.I. Port Auth.*, 911 F. Supp. 907, 912-13 (D.V.I. 1996).

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment on Plaintiff's punitive damages claim to the extent that Plaintiff seeks punitive damages under Title VII, the Virgin Islands Civil Rights Act, and the Virgin Islands employment discrimination statute.

## IV.    CONCLUSION

Based on the foregoing, the Court will grant in part and deny in part Defendant's Motion for Summary Judgment. Specifically, the Court will grant Defendant's Motion on statute of limitations grounds, as it pertains to all Title VII claims of discrimination that occurred more than 300 days prior to the filing of Plaintiff's charge of discrimination with the EEOC; grant Defendant's Motion on Plaintiff's constructive discharge claim; grant Defendant's Motion on Plaintiff's claim for punitive damages; deny Defendant's Motion as to administrative exhaustion of Plaintiff's "denial of tenure" allegations; deny Defendant's Motion on its claim that Plaintiff has not established the existence of respondeat superior liability; deny Defendant's Motion on its claim that no private cause of action exists under the Virgin Islands Civil Rights Act; and deny all but one of Plaintiff's defamation claims. The Court will also deny, without prejudice, Defendant's Motion as it pertains to Plaintiff's claims under the Virgin Islands Civil Rights Act, and set a briefing schedule for further briefing, in view of the caution expressed by the Supreme Court of the Virgin Islands against using federal jurisprudence to interpret the local Civil Rights Act.

An appropriate Order accompanies this Memorandum Opinion.

Date: May 19, 2016                        _____/s/_____
                                          WILMA A. LEWIS
                                          Chief Judge

44